IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 19, 2022

## STATE OF TENNESSEE v. RYAN WINSTON

**Appeal from the Criminal Court for Shelby County**
**No. C1902454/ 19-61781   W. Mark Ward, Judge**

_____

### No. W2021-01315-CCA-R3-CD

_____

The Defendant-Appellant, Ryan Winston, was convicted of two counts of felony murder and one count each of first-degree premeditated murder, especially aggravated robbery, and aggravated burglary.  The trial court merged the murder convictions and imposed an effective sentence of life imprisonment.  On appeal, the Defendant asserts that:  1) the evidence is insufficient to support the convictions; 2) the State's late disclosure of cell phone records warranted either a continuance of the trial or the exclusion of the records; and 3) the trial court erred in failing to exclude the cell phones of the Defendant and the co-defendants and the records resulting from the extractions of the cell phones because the State failed to establish the chain of custody for the cell phones.  After careful review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined, and JOHN EVERETT WILLIAMS, J., (not participating).[1]

Ramon Damas (on appeal), and Craig Morton (at trial), Memphis, Tennessee, for the Appellant, Ryan Winston.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Austin Scofield, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

---

[1] The Honorable John Everett Williams passed away on September 2, 2022, and did not participate in this opinion.  We acknowledge his faithful service to this Court.

The instant case stems from the robbery and murder of the victim, Tyler Gurien, at his home in Shelby County during the early morning hours of December 26, 2013. According to the evidence presented at trial, the Defendant and co-defendant Mark Whiteley devised a plan to rob the victim, a drug dealer and an acquaintance, and they recruited co-defendant Jonathan Bolden to assist in the robbery. In accordance with the plan, Whiteley went to the victim's home to "hang out" with the victim while the Defendant and Bolden remained outside the victim's home and communicated with Whiteley through text messages. Whiteley sent a text message, stating that he was leaving, and Bolden fled the scene before the robbery occurred. Once the victim opened the front door to allow Whiteley to leave, the Defendant entered the home and shot the victim once with a sawed-off shotgun. The victim fled to the basement where he collapsed and died, and the Defendant and Whiteley took marijuana from the home.

The Defendant and the co-defendants were arrested and, according to various pleadings in the record, they were indicted in 2014 for multiple offenses related to the incident.[2] The trial was continued on numerous occasions due, in part, to multiple changes in counsel by the Defendant and the co-defendants. In a superseding indictment issued in March 2019, the Defendant and the co-defendants were charged with felony murder in the perpetration of or attempt to perpetuate robbery, especially aggravated robbery, felony murder in the perpetration of or attempt to perpetrate aggravated burglary, aggravated burglary, and first-degree premeditated murder. The Defendant's trial occurred on June 21 through June 25, 2021.

**Trial.** Whiteley's mother testified that in 2013, she was renting a home where she lived with her son, Bolden, and the Defendant, who she knew as "Chubbs." She explained that Whiteley had a drug addiction and had been in trouble previously as a result of his addiction. On cross-examination, Whiteley's mother testified that on December 27, 2013, she was at her home when the police arrived to execute a search warrant. She saw Whiteley with a pistol in his back pocket. She knew that he was not allowed to possess a weapon and asked him about the gun. Whiteley told her that "around this neighborhood you have to." She agreed that she told police officers that Whiteley was armed.

Whiteley testified that he was charged with the criminal offenses resulting from the incident and that the State had made no promises to him in exchange for his testimony, even though he hoped to receive some consideration. He agreed that in 2013, he had a serious drug problem, which resulted in his obtaining multiple theft and drug-related charges. On December 25, 2013, Whiteley was living at a home with his mother and the Defendant, who Whiteley knew as "Chubbs." Bolden stayed with them

---

[2] The 2014 indictment is not included in the appellate record.

"[s]ometimes." Whiteley, Bolden, and the Defendant knew each other from the neighborhood, and when Whiteley was asked whether their group was a neighborhood gang, he responded, "I guess you could say that." A few other people outside the neighborhood also were involved in the gang, and the Defendant acted as a leader of the gang. Whiteley also knew the victim through the neighborhood and last saw the victim alive during the early morning hours of December 26th. The victim's house was located on the other side of the neighborhood, and Whiteley would occasionally go to the victim's home.

Whiteley testified that on December 25, 2013, he returned home around 6:00 p.m. where he saw the Defendant and Bolden. After Bolden left the home, Whiteley and the Defendant began discussing ways to obtain money and drugs and decided to rob the victim. Whiteley stated that the victim sold and used drugs, and Whiteley was aware that the victim kept money and drugs in his home. According to the plan, Whiteley was to go to the victim's home and "hang out" with the victim. He would contact the Defendant and Bolden as he was leaving so that they could enter the home and commit the robbery. Whiteley was chosen to go to the victim's home first because he was friendly with the victim. Whiteley could not open the front door of the victim's home to allow the Defendant and Bolden to enter because the victim kept the front door locked and the interior lock to the door required a key to unlock. Although Bolden was not present when the robbery was planned, Whiteley believed the Defendant sent Bolden a text message about the plan.

Whiteley testified that he arrived at the victim's home around midnight and remained there for about two hours. During this time, Whiteley, the Defendant, and Bolden communicated with each other through text messages on their cell phones. Whiteley stated that at one point, he sent a text message to the Defendant asking for his location and that the Defendant responded that he was near the victim's house. Whiteley later sent the Defendant a text message, notifying the Defendant that he was leaving. When the victim opened the front door for Whiteley to leave, the Defendant pushed Whiteley out of the way and shot the victim once using a sawed-off shotgun. Whiteley agreed that the Defendant fired the shotgun immediately after Whiteley exited the house. Whiteley stated that although Bolden had communicated to him that he was in the woods and walking toward the victim's home, Bolden was not at the home when the shooting occurred, and Whiteley did not see Bolden for the remainder of the night.

Whiteley testified that after the Defendant fired the shotgun, Whiteley reentered the house where he took drugs, a gun, and money. He and the Defendant returned to their home where they split the proceeds, and Bolden did not receive any of the proceeds. Whiteley said he and the Defendant wrapped "the gun" in a black garbage bag and buried it, along with the victim's identification and some of his personal items, in the backyard

under a pile of leaves. They threw a backpack taken from the victim's home in a wooded area located down the street from their home. Police officers later came to Whiteley's home and retrieved the gun taken from the victim's home, which was on Whiteley's person. Following Whiteley's arrest, he gave a statement to police officers and told them where the shotgun and the backpack were located.

Whiteley testified that on the morning of December 26th, the Defendant instructed Bolden to return to the victim's house and call the police so that the police may think that someone else committed the offenses, and Whiteley believed Bolden followed the Defendant's instructions. Whiteley stated that he did not see the victim after the Defendant shot him and that when he left the victim's house, he did not know whether the victim was alive or dead. Whiteley believed he later learned from Bolden that the victim had died.

Whiteley stated that if anyone within his group engaged in prohibited conduct, the person could be placed "in violation" and could be required to fight. He could not remember whether Bolden was placed "in violation" but acknowledged that fleeing from a robbery planned with other gang members would result in the member's being placed in violation. Whiteley described Bolden as a follower rather than a leader.

Whiteley believed he communicated with Bolden through text messages following the robbery, but Whiteley could not recall what the text messages stated. Whiteley testified that prior to his arrest, he deleted from his cell phone the text messages that he exchanged with the Defendant and Bolden during the time period prior to the robbery and through December 26th. Whiteley stated that following his arrest, the police officers seized his cell phone, and that he consented to a search of his cell phone. He identified both his cell phone number and the Defendant's cell phone number.

On cross-examination, Whiteley acknowledged that he had a prior federal heroin conviction in New York involving the importation of the drug from another country. In 2013, he was on parole for the federal charge and had pending charges in Tennessee to which he pled guilty. He was charged with violating the terms of his federal parole but had not yet been sentenced at the time of trial. He denied that he sold drugs, but he acknowledged that he "traded drugs."

Whiteley testified that although the commission of a robbery was discussed prior to December 25th, the robbery was not actually planned until that date. He maintained that shooting the victim was not part of the plan and that the plan was to "rob this man and that was it." He did not recall the number of text messages that he sent while at the victim's home or whether the majority of those text messages were sent to Bolden rather than the Defendant. Whiteley stated that the Defendant was the only person at the crime

scene who possessed a weapon. Whitely said that as soon as the victim opened the front door to allow Whiteley to leave, the Defendant pushed Whiteley out of the way and shot the victim while the Defendant was standing around the area of the front door and the victim was standing behind and to the side of Whiteley. Whiteley did not know where the victim was struck because Whiteley did not see the victim after he was shot, and Whiteley did not see the victim when Whiteley reentered the house. He agreed that he and the Defendant ransacked the victim's house before leaving.

Whiteley testified that prior to the robbery, he and the Defendant retrieved a long barrel shotgun from a neighbor and planned to give it to Bolden. Whiteley did not give the shotgun to Bolden but agreed that he told police officers that Bolden had a shotgun. Whiteley did not recall seeing Bolden after the shooting. He agreed that he sent a text message to Bolden informing him that he was "in violation," which is a gang-related term. Whiteley testified that following the shooting, the Defendant instructed Bolden to retrieve the victim's cell phone from the home, and Bolden told Whiteley that he found the victim's cell phone and discarded it. Whiteley agreed that once he learned of Bolden's arrest, he used his cell phone to research news stories about the shooting.

On redirect examination, Whiteley testified that he had previously purchased drugs from the victim. He agreed that he believed he could commit the robbery without later being arrested because based on his experience, those who sell drugs generally do not contact the police when robbed. Whiteley stated that the police officers did not locate the shotgun and the backpack when they initially came to his home but later found the items after Whiteley informed the officers where the items were hidden. Whiteley acknowledged that the Defendant was the leader of the "crew," devised the plan to commit the robbery, accompanied Whiteley to retrieve the second shotgun from the neighbor, arrived at the victim's home with a shotgun, pushed Whiteley out of the way in order to shoot the victim, instructed Bolden to return to the victim's home to retrieve the victim's cell phone and to report the homicide, and helped Whiteley hide the shotgun and other items following the shooting.

Charles Smith, the victim's neighbor, testified that on the afternoon of December 26, 2013, he was with another neighbor, Adam Mitchell, when he saw Bolden pacing up and down the street. Bolden asked Smith whether he had seen the victim, and Smith replied that he had not seen the victim for a couple of days. Smith said Bolden was worried about the victim and wanted to check on him. Smith, Mitchell, and Bolden entered the victim's house through the front door, which was open, and they saw blood on the carpet and "little tracks and stuff." Smith and Mitchell followed Bolden, who "went straight to the basement" where they found the victim's body. Smith believed the victim was lying on his back. They called the police, and when officers arrived, they

asked Smith questions and placed him in the backseat of a police car. He subsequently gave a statement to the police.

Officer Brian Hall of the Memphis Police Department ("MPD") testified that he responded to a call to the victim's home and was the first officer to arrive. He spoke to three people at the scene, who stated that they had been inside the victim's home, and Officer Hall detained them in separate police vehicles. Officer Hall cleared the home and observed a body in the basement.

Sergeant Fausto Frias with the MPD's homicide unit testified that he responded to the scene of the shooting and assisted in processing the crime scene. He stated that the home had a front entryway with a wooden floor that was approximately ten feet long before the floor transitioned to carpet. He observed a substance that appeared to be blood on the wooden floor at the end of the entryway before the floor transitioned to carpet. A stairwell was located on the left where the carpet began, and drops of a substance that appeared to be blood and a key attached to a lanyard were on the floor in front of the stairwell. Sergeant Frias located a shotgun shell on the stairs, and a red substance that appeared to be blood was on a door located at the bottom of the stairs. The victim was found lying on the basement floor on his stomach and in a pool of blood. Sergeant Frias stated that a bedroom in the victim's home appeared to have been "ransacked" and that someone removed the drawers from the dresser in an apparent effort to search through them.

The case officer informed Sergeant Frias that he learned through the investigation of other locations where evidence could be found. Officers obtained and executed search warrants at these locations, and officers encountered Whiteley at one of the locations. Sergeant Frias stated that Whiteley told the officers where the shotgun and a backpack were located.

On cross-examination, Sergeant Frias testified that he observed no signs of forced entry and no blood by the front door. He agreed that there was no evidence indicating that the victim was shot while standing in the doorway of the front door. He explained that the evidence indicated that the victim sustained the gunshot wound while standing at the top of the stairwell, walked down the stairs, held onto the door at the bottom of the stairs in an effort to maintain his balance, and then collapsed onto the basement floor. Sergeant Frias observed no injuries on the victim suggesting that he fell down the stairs. On redirect examination, he agreed that the blood evidence was consistent with testimony that the shooter stepped inside the front doorway and shot the victim with a twelve gauge shotgun as the victim stood at the end of the entryway on the wooden floor.

- 6 -

Sergeant Frias testified that based upon his prior experience investigating homicides where the perpetrator moved the homicide victim's body, the evidence in this case was not consistent with the shooter's having moved the victim's body to the location in which he was discovered. He explained that when a victim's body has been moved, the victim's arms, typically, are in an extended position but that in the instant case, the victim's hands were tucked into his chest. He further explained that if the victim had been carried to the basement, blood would have been "all over the place" because the shooter likely would have stepped in the victim's blood.

Officer Anthony Barbarotto with the MPD's Crime Scene Unit assisted in conducting a search of the home where the Defendant and the co-defendants lived. He testified that he collected what appeared to be a spent shotgun cartridge in a trash can and multiple shotgun cartridges throughout the home. He collected three shotgun cartridges, a live .22 round of ammunition, and a driver's license belonging to the Defendant from a desk drawer in a bedroom. He also recovered a black .22 caliber revolver from underneath a mattress inside the home.

Officer Barbatotto testified that he collected a shotgun cartridge in an area of heavy leaf foliage in the backyard. In the same area, he also collected a Winchester 12-gauge shotgun that was missing its arm stock and had a barrel end that was "blown out." The shotgun was wrapped in black plastic and partially covered by leaf foliage. Officer Barbarotto located a plastic bag containing a black backpack in a nearby vacant lot. The backpack contained a spook, a red cap, a coffee cap, and a small metal piece that was wrapped in plastic and had a black tar substance burned into it. Sergeant David Galloway subsequently collected the victim's identification card, a social security card, and assorted papers that were inside a dog pen in the backyard

Former MPD Sergeant Andrew Hurst testified that when he arrived at the crime scene, Bolden was sitting in the back seat of a police car. Officers questioned Bolden, who implicated Whiteley and the Defendant, and all three were arrested. The prosecutor asked, "As part of this investigation did you collect phones from all three individuals?" Sergeant Hurst responded, "Yes, sir," and he stated that he tagged the cell phones into evidence. He identified the cell phones belonging to the Defendant, Whiteley, and Bolden, and each cell phone was entered as an exhibit at trial without objection by the defense.

On cross-examination, Sergeant Hurst testified that while Bolden was sitting in the backseat of the police car at the scene, Bolden appeared angry, was beating on the car windows, and was stating that he needed to go to work. As a result of Bolden's behavior, Sergeant Hurst suspected that Bolden was involved in the offenses. After Bolden made an initial statement to the police, he indicated that he wanted to make another statement,

and he was brought from the jail to the homicide office. However, he did not make the statement because he became belligerent with officers and was sent back to his cell.

Sergeant Hurst acknowledged that the envelope containing each of the cell phones listed the recovery date as January 10, 2014, and the date in which they were logged into the property room as July 3, 2015. He stated that he did not know when the cell phones were actually recovered. Defense counsel asked Sergeant Hurst whether he knew where the cell phones were from December 26th, 27th, or 28th until they were documented as recovered by MPD on January 10th, and Sergeant Hurst replied, "They would have been recovered and taken to the forensic dump people, which is in the ICAC unit." He subsequently acknowledged that he did not know the location of the cell phone between the time that he obtained the cell phones and January 10th. He could not recall whether, after collecting the cell phones, they were logged into the evidence room or taken to the ICAC unit.

On redirect examination, Sergeant Hurst testified that due to the limited staff around Christmas of 2013, he was investigating several other homicides at the same time as the victim's homicide. He said that while investigating several cases at once, he would sometimes lock cell phones that he recovered in his desk until he could take them to the ICAC unit. He stated that January 10th could have been the date in which he took the cell phones to the ICAC unit, that the ICAC unit was often delayed in conducting cell phone extractions, and that July 3rd could have been the date in which the cell phones were returned by the ICAC unit. Sergeant Hurst testified that the cell phones appeared to be in the same condition at trial as they were when he initially collected them. On recross-examination, Sergeant Hurst acknowledged that he did not have any independent memory of whether he locked the cell phones in his desk for a period of time and that there was no record reflecting that this occurred.

Investigator Greg Flint with the Shelby County District Attorney General's Office, who testified as an expert in forensic examinations of mobile devices, performed extractions on the three cell phones recovered by the police. He stated that extractions were performed in 2014 but that no information of value was recovered. He explained that Cellebrite, the program used to conduct the extractions, had improved substantially since 2014. Investigator Flint performed extractions on the cell phones using the newer Cellebrite technology, and in some instances, he was able to recover information that had been deleted from the cell phones. Although he was able to extract some information from Whiteley's cell phone, none of the information was relevant to the case, and he was unable to recover some of the information that had been deleted from the cell phone. Investigator Flint successfully extracted information from Bolden's cell phone, including the text messages between Whiteley and someone listed in the cell phone as "Chubb," whose cell phone number was the same number identified by Whiteley at trial as

belonging to the Defendant. These text messages had been deleted from Bolden's cell phone, but Investigator Flint was unable to determine when they were deleted.

Investigator Flint testified regarding the information extracted from Bolden's cell phone showing the interactions between Bolden, Whiteley, and "Chubb" from December 25 to December 26, 2013. The extraction report of the information and a timeline of the data recovered were entered as exhibits by the State without objection by the defense. According to Investigator Flint's testimony, the extraction of Bolden's cell phone recovered the following information:

| December 25, 2013 at 11:37 p.m. and 17 seconds | "Chubb" called Bolden, and the call lasted one minute and fourteen seconds. |
| --- | --- |
| December 26, 2013 at 12:57 a.m. and 7 seconds | "Chubb" sent a text message to Bolden stating, "What up m it about s0me m0ney." |
| 12:57 a.m. and 23 seconds | Bolden called "Chubb," and the call lasted twenty-six seconds. |
| 2:04 a.m. and 44 seconds | Bolden sent an instant message to Whiteley stating, "Wazup." |
| 2:09 a.m. and 26 seconds | Bolden sent an instant message to Whiteley stating, "It say you okay." |
| 2:10 a.m. and 50 seconds | Whiteley sent a text message to Bolden stating, "Yeah, just got here." |
| 2:11 a.m. and 18 seconds | Bolden sent a text message to Whiteley stating, "who there." |
| 2:11 a.m. and 31 seconds | Bolden sent a text message to Whiteley stating, "in wat." |
| 2:12 a.m. and 15 seconds | Whiteley sent a text message to Bolden stating, "me and him." |
| 2:20 a.m. and 53 seconds | Bolden sent a text message to Whiteley stating, "what going on." |
| 2:21 a.m. and 34 seconds | Bolden sent a text message to Whiteley stating, "we gone be outside." |
| 3:06 a.m. and 40 seconds | Bolden sent an instant message to Whitely stating, "what he got." |
| 3:09 a.m. and 7 seconds | Whiteley sent a text message to Bolden stating, "Kush," which Investigator Flint testified was high-grade marijuana. |
| 3:10 a.m. and 28 seconds | Bolden sent a text message to Whiteley stating, "we in the bushes across the street." |
| 3:12 a.m. and 26 seconds | Whiteley sent a text message to Bolden stating, "let me |

| | |
|---|---|
| | know when you're close enough to do." |
| 3:23 a.m. and 39 seconds | Bolden had an incoming call from "Chubb" lasting five seconds. |
| 3:26 a.m. and 5 seconds | Whiteley sent a text message to Bolden stating, "what up." |
| 3:29 a.m. and 12 seconds | Bolden sent a text message to "Chubb" stating, "we're you." |
| 3:29 a.m. and 52 seconds | "Chubb" sent a text message to Bolden stating, "bay da d00d." |
| 3:32 a.m. and 20 seconds | "Chubb" sent a text message to Bolden stating, "you can g0 0n." |
| 3:32 a.m. and 36 seconds | "Chubb" sent an instant message to Bolden stating, "Igtit," which Investigator Flint stated was either "I get it" or "I got it." |
| 3:30 a.m. and 3 seconds | Whiteley sent Bolden an instant message stating, "how long." |
| 3:48 a.m. and 36 seconds | Bolden called "Amber," which lasted second seconds. |
| 11:05 a.m. and 35 seconds | Whiteley sent Bolden an instant message stating, "you in violation." |
| 11:05 a.m. and 38 seconds | "Chubb" sent Bolden an instant message stating, "where are you." |
| 11:08 a.m. | Bolden called Whiteley, which lasted nine seconds. |
| 11:09 a.m. | Whiteley called Bolden, and the call lasted one minute and forty-eight seconds. |
| 11:15 a.m. | Bolden called "Chubb," and the call lasted two seconds. |
| 11:16 a.m. and 30 seconds | Bolden called "Chubb," and the call lasted three seconds. |
| 11:20 a.m. and 3 seconds | Bolden called "Chubb," and the call lasted eight seconds. |
| 11:26 a.m. and 28 seconds | Bolden called "Chubb," and the call lasted thirty-five seconds. |
| 11:35 a.m. and 37 seconds | "Chubb' called Bolden, and the call lasted thirteen seconds. |
| 11:44 a.m. and 9 seconds | Bolden sent a text message to "Chubb," stating "y'all my family. Y'all all I got for." |
| 11:47 a.m. and 3 seconds | Bolden sent a text message to "Chubb," stating "my f**k up. I leave these Xanax up for my waste of time in." |
| 12:36 p.m. and 52 seconds | "Chubb" called Bolden, and the call lasted one minute and one second. |
| 12:40 p.m. and 59 seconds | Bolden called "Chubb," and the call lasted thirty seconds. |

On cross-examination, Investigator Flint testified that he collected the cell phones from the property room and conducted the extractions in May 2021. He agreed that he did not have any independent knowledge regarding the location of the cell phones from the date of the offense until he received them. He stated that the cell phone with the number listed in Bolden's cell phone as belonging to "Chubb" was not supported by Cellebrite, so he could not perform an extraction. Although Investigator Flint turned on the cell phone, there was no data on the cell phone, and he did not know whether the data was intentionally deleted.

Jonathan Bolden testified that he was charged with the offenses along with the Defendant and Whiteley. Bolden maintained that he had not received any promises from the State in exchange for his testimony at trial, but he acknowledged that he hoped the State would take his testimony into consideration. He had a prior conviction for burglary of a motor vehicle and had previously been a member of the Crips gang. By December 2013, he was associated with a new group that included Whiteley and the Defendant, who Bolden knew as "Chubb." Bolden agreed that the group "kind of" operated in the same manner as a gang and stated that the Defendant was the leader. Bolden stated that like a gang, a member of the group could be held "in violation" for breaking one of the group's rules and that the Defendant had the authority to find a group member "in violation" of a rule. Bolden testified that in 2013, he stayed with the Defendant and Whiteley on occasion in a home rented by Whiteley's mother. Bolden acknowledged that during that time period, he had a "drug habit," which included cocaine, heroin, and methamphetamine. He also occasionally sold or exchanged Xanax and Lortab pills.

Bolden testified that on the evening of December 25, 2013, he received a call from the Defendant, who instructed him to come to the home where the Defendant and Whiteley were living. Bolden had a friend drive him to the home and arrived around 11:30 or 11:45 p.m. When he arrived, the Defendant informed him of the plan to rob the victim of marijuana, and Bolden agreed to participate. Bolden stated that when he and the Defendant discussed the planned robbery, Whiteley was already at the victim's home. Bolden said that because the victim kept his front door locked, Whiteley needed to be inside the home to open the door. Bolden explained that according to the plan, he would "ransack" the victim's house while the Defendant held a gun on the victim. Bolden maintained that he never agreed to killing the victim. After approximately fifteen minutes, Bolden and the Defendant left, walking toward the victim's house.

Bolden testified that the Defendant led the way to the victim's house and had a shotgun hidden in the leg of his pants. Bolden denied that he had a gun or that the Defendant and Whiteley borrowed a shotgun from someone to give to Bolden for the robbery. Bolden stated that he, Whiteley, and the Defendant each had cell phones and were communicating with each other primarily through text messages. After Bolden and

- 11 -

the Defendant walked through a "cut," Whiteley sent a text message that he was leaving the victim's home. The Defendant pulled the shotgun from his pants, placed it on his shoulder, and began walking quickly toward the victim's home. When the Defendant was not looking, Bolden turned and ran down a trail toward Ben Compton's home. Approximately two to three minutes after the Defendant began walking toward the victim's home and as Bolden was running down the trail, Bolden heard a "loud boom" that sounded like a single gunshot from a shotgun.

Bolden testified that upon arriving at Compton's home, he told Compton that the Defendant was attempting to rob the victim, that Bolden heard a gunshot, and that he believed the Defendant shot the victim. Bolden did not think that Compton believed him and that Compton may have thought that Bolden had been taking drugs. Compton told the Defendant to not call the police and that they would check on the victim in the morning. Bolden tried to sleep on Compton's couch but was unable to do so because he continued to receive text messages. He turned off his cell phone around 2:00 or 3:00 a.m.

Bolden turned on his cell phone after he awoke the next morning at around 10:40 or 10:50 a.m., and he began receiving text messages asking where he was and telling him that he needed to get his clothes and that he was "in violation." He received a call from Whiteley during which Bolden spoke to the Defendant. The Defendant threatened to "blow [Bolden's] a** off" and stated that he did not trust Bolden, who offered to give his Xanax pills to the Defendant since Bolden did not participate in the robbery. Bolden later went to Whiteley's home where he spoke to Whiteley and the Defendant. The Defendant told Bolden that he had "off'd" the victim, which Bolden believed to mean that the Defendant had killed the victim.

Bolden testified that he called Compton, told him what the Defendant had stated, and then went to the victim's home. Bolden stated that the front door was open, so he entered the house, saw blood on the floor, and went down the stairs to the basement where he found the deceased victim. Bolden exited the victim's home and saw Smith and an older man and told them to call for help. Bolden said that they entered the house and that he led the other two men to the victim's body. Bolden called the police, and when officers arrived at the scene, they told him that they needed for him to answer a few questions and placed him in the backseat of a police car. Bolden told the officers that he needed to go to work, and he acknowledged at trial that he did not want to talk to the officers. The officers transported him to the police department, and Bolden acknowledged that he was angry and confused. After officers allowed him to speak to his mother, Bolden told the officers what had occurred, and he was arrested for the offenses.

Bolden stated that after he was booked, the police officers took his cell phone and that he consented to a search of the cell phone. He acknowledged that prior to his arrest

and following the victim's death, he attempted to delete text messages from his cell phone. He testified that he recalled each of the calls and text messages that he received leading up to and following the offenses. He recalled that on December 26, 2013, at 11:37 p.m., he received a call from the Defendant, who was listed as "Chubb" in Bolden's cell phone. The Defendant instructed Bolden to come to the home where the Defendant and Whiteley were living. Bolden recalled receiving a text message from the Defendant at around 12:37 a.m. stating, "what up am about some money." Bolden explained that he had not yet arrived at the home where the Defendant and Whiteley were living and that he went to the home shortly thereafter. He stated that when he sent a text message to Whiteley at about 2:20 a.m. stating, "we gonna be outside," he meant that he and the Defendant were by the victim's house. When Bolden sent a text message to Whiteley about 3:10 a.m. stating, "we in the bushes across the street," Bolden meant that he and the Defendant were across the street from the victim's house. Bolden said that the Defendant responded to a text message asking for his location, stating "bay da d00d," which Bolden testified could mean by the door. Bolden stated that when the Defendant sent him a text message at 3:32 a.m. stating, "you can go on," Bolden had already fled the scene.

Bolden recalled that after he turned his cell phone back on the next morning, he received a text message from Whiteley at approximately 11:05 a.m. stating that Bolden was "in violation" and a text message from the Defendant asking where Bolden was. Shortly thereafter, Whiteley called Bolden, and the Defendant talked to Bolden on Whiteley's cell phone and threatened him. Bolden acknowledged that he attempted to call the Defendant several times. Bolden said he sent a text message to the Defendant offering him Xanax in the hopes that the Defendant would not kill him.

On cross-examination, Bolden acknowledged that he had prior altercations with the victim but explained that they would then "get cool again." He recalled a text message exchange with the victim on December 22nd and 23rd of 2013 during which Bolden sent the victim a rap video and the victim responded that Bolden should "think twice before stepping for my back door." The victim later sent a text message stating that he was going to bed and told Bolden to "[h]olla at me." Bolden responded with a text message stating, "go to bed. You won't wake up." The victim sent a text message stating, "cool," with a photographs of guns, and Bolden responded, "I just robbed big dawgs."

Bolden testified that while he and the Defendant were walking toward the victim's house, they met Justin Stubbs, and Bolden recalled purchasing drugs from Stubbs and telling him about the planned robbery. Bolden stated that although Stubbs was armed, he did not participate in the robbery, and Bolden did not recall identifying Stubbs as a

participant to police officers. Bolden later testified that he recalled identifying the participants to the police officers as the Defendant, Whiteley, and Stubbs.

Although Bolden acknowledged that he was known to carry a weapon and that he previously owned a shotgun, he maintained that he was not armed on the night of the robbery. Bolden testified that the Defendant's shotgun had tape on it. He explained that when he told officers that the shotgun was buried at East Shore Drive, he was repeating what Whiteley had told him. Bolden stated that during a court appearance, Whiteley told him where the shotgun was actually hidden.

Bolden testified that he agreed to make a second statement on the day after his initial statement to the police but that an officer tried to coerce Bolden into providing false information. Bolden acknowledged making a subsequent statement to the police in which he said he did not go into the victim's house with the Defendant because he was afraid that the Defendant was going to "off me after he off'd [the victim]." Bolden stated that while he and the Defendant were discussing the planned robbery, the Defendant also stated that he planned to kill the victim. Bolden maintained that he did not believe the Defendant would actually kill the victim, and Bolden stated that he was afraid he would be harmed if he did not agree to assist the Defendant.

On redirect examination, Bolden testified that he and the victim were joking during the text message exchange and that he did not kill the victim following the exchange. Bolden stated that he heard the shotgun blast no less than six minutes after he began fleeing the area. Bolden told Whiteley and the Defendant that he was not able to be at the robbery because police officers stopped him while he was walking in the area and detained him for failing to have identification. Bolden explained that he did not want the Defendant and Whiteley to know that he simply became frightened and fled prior to the robbery.

Benjamin Compton testified that he lived approximately four blocks away from the victim, who was like a son to him. Compton also knew the Defendant and the co-defendants. Compton was aware that Bolden had a drug problem, and Bolden slept at Compton's home on occasion. Compton stated that one or two days prior to the offenses, the Defendant offered to sell him a sawed-off shotgun because the Defendant owed someone money.

Compton testified that during the early morning hours of December 26, 2013, while he was feeding his son who was a few months old, Bolden came to his home. Bolden was upset and stated, "I told him not to shoot that guy." Bolden did not mention the victim or anyone else by name. Compton initially testified that he believed Bolden arrived around 11:00 p.m. but acknowledged that if he told police officers that Bolden

arrived at 3:30 a.m., this time was likely accurate. Compton believed Bolden was "just high" and instructed him to lie down on a couch. Bolden did not have a shotgun, a backpack, drugs, or money with him, and Compton did not see any blood on Bolden. Bolden asked for a pair of socks because his socks were wet, and Compton gave him socks to wear. Bolden began sending text messages on his cell phone and was continuing to do so when Compton went to bed. On the following day, Compton told his son's mother, Ashley, that he "had a bad feeling" and that they should check on the victim. Compton believed Bolden also called Ashley and told her that he was at the victim's home and that they should come there. When Compton and Ashley arrived, they saw police officers outside the victim's home, and Compton subsequently learned of the victim's death.

Former MPD Sergeant Michael Brown testified that he and Sergeant Hurst interviewed the Defendant on December 27, 2013. Sergeant Brown advised the Defendant of his rights, and the Defendant waived his rights and agreed to the interview. Sergeant Brown stated that during the initial interview, the Defendant admitted that he knew about the plan to commit the robbery and he received proceeds from the robbery. Sergeant Brown took a written statement from the Defendant, which the Defendant reviewed, initialed, and signed.

According to the Defendant's statement, he acknowledged that he was aware that the MPD was investigating the victim's homicide, but he denied that he was responsible. He stated that on December 25th, he was at a family gathering at his aunt's home from 7:00 p.m. until 12:00 a.m., after which his sister drove him to Whiteley's house. The Defendant maintained that Bolden killed the victim and that Bolden admitted to doing so. The Defendant stated that several days prior to the robbery, Bolden said that he was going to rob the victim and that he was "tired of that guy f***ing with him." The Defendant said that after he returned from his aunt's home, Whiteley admitted to him that he also was involved in the robbery. The Defendant told the officers that Whiteley was at the victim's home prior to the robbery and that when the victim opened the door for Whiteley to leave, Bolden ran into the home and shot the victim once. The Defendant said that the victim walked down the stairs while Whiteley and Bolden grabbed drugs from the home and fled. The Defendant stated that Whiteley gave him five bags of "Kush" or marijuana, and the Defendant admitted that he was aware that the drugs were proceeds from the robbery. He said that Whiteley stated that he also obtained twenty dollars from the robbery but that he "took it to the dope man."

The Defendant told the officers that Bolden shot the victim with a twelve-gauge shotgun that was "black and brown with a regular handle." The Defendant said that the shotgun belonged to him and that he asked Bolden to hold the shotgun for him while he was at his family gathering so that Whiteley would not steal it and pawn it in order to

- 15 -

purchase drugs. The Defendant stated that Whiteley said he did not know what Bolden did with the shotgun following the robbery.

Sergeant Brown testified that prior to interviewing the Defendant, he had interviewed Bolden and believed he was present for an interview with Whiteley. Sergeant Brown was aware that others had implicated the Defendant in the robbery, and Sergeant Brown stated that the Defendant partially implicated himself in the offenses. Sergeant Brown said that some of the information provided by the Defendant "coincided" with some information provided by the other suspects and that "as far as the statement that he gave, what was in the statement, the facts they appear to be mostly truthful facts."

On cross-examination, Sergeant Brown testified that based on a supplemental report, Bolden identified three individuals as participating in the offenses. Sergeant Brown recalled an occasion when he brought Bolden from jail due to Bolden's request to provide another statement. Sergeant Brown denied coercing Bolden or otherwise attempting to persuade him to make statements further implicating himself. On redirect examination, Sergeant Brown testified that Bolden basically provided the same information as he had provided in his second statement. Bolden believed his charges would be changed as a result of his second statement even though no one made such promises, and he became upset when the charges remained the same. Sergeant Brown testified that Bolden initially was reluctant to provide information because he did not want to implicate himself and the Defendant had threatened to kill him. Bolden also did not want to go to jail because he was afraid that he would see the Defendant, who would then kill him.

Dr. Marco Ross, a forensic pathologist and an expert in forensic pathology, conducted the victim's autopsy. Dr. Ross testified that the victim's cause of death was a shotgun wound to his chest and that his manner of death was homicide. He stated that the entry wound was located on the left frontal area of the victim's chest, that the main mast of pellets perforated his left fifth rib and his heart, and that several additional pellets entered his left lung, his diaphragm, and his stomach. The wadding, the plastic material that holds the pellets together, was located inside the victim's chest. Stippling caused by gunpowder particles and particles from the filler and pellets was on the victim's right and left upper arms. Dr. Ross stated that due to the "sort of central defect" surrounded by "satellite pellet wounds," the stippling, and the wadding found in the victim's chest, the range in which the shotgun was fired was approximately four to eight feet.

On cross-examination, Dr. Ross testified that he reviewed photographs of the crime scene and noted blood on top of the stairs and going down the stairs to where the victim was found. He stated that the victim's injury would not have rendered him incapable of movement and that the photographs suggest that the victim was shot upstairs

and that he was able to "stumble" downstairs. Dr. Ross was unable to determine the victim's position at the time of the shooting based upon the photographs. He testified regarding the difficulty in determining the precise trajectory of a shotgun shell due to the pellet spread. He stated that the predominate overall trajectory was from the victim's front to his back but that the location of pellets on the victim's arm indicate that there may have been a slight shift toward the victim's left side.

The defense presented the testimony of Novella Williams, the Defendant's great aunt. Williams testified that on Christmas Day of 2013, she hosted a family gathering at her home, which the Defendant attended. She presented a photograph of the Defendant from the party taken at 10:12 p.m. She stated that the Defendant stayed to help take her husband, who was in a wheelchair, to bed and that the Defendant left at around 1:10 or 1:15 a.m.

The defense also presented the expert testimony of Michael Tillery, the Director of Digital Forensics at Black Swan Digital Forensics, who attempted to extract data from the three cell phones previously referenced by Investigator Flint. He was unable to conduct an extraction of a flip phone with a cell phone number that other witnesses identified as belonging to the Defendant. He was able to obtain a full extraction from one cell phone and a partial extraction from another cell phone. He noted "subtle differences" between the information obtained from the extraction conducted by the State and the information obtained from the extraction that he conducted. However, he also noted that "nothing of any evidentiary value was different."

Tillery identified a photograph of a man holding a shotgun that was extracted from Bolden's cell phone. He stated that the photograph was created on December 22 and was accessed on December 24, 2013. The photograph had been deleted from the cell phone, but Tillery said he could not determine when the photograph was deleted. He also identified a photograph of two pistols extracted from the cell phone and stated that the photograph was created on December 23rd and was associated with a text or SMS message. Tillery testified that on December 30, 2013, the cell phone from which he obtained a partial extraction received a call from the cell phone number attributable to the flip cell phone.

At the conclusion of the proof, the jury convicted the Defendant of first-degree premediated murder, two counts of felony murder, especially aggravated robbery, and aggravated burglary as charged in the indictment. The trial court merged the murder convictions and imposed a sentence of life imprisonment. In accordance with an agreement reached by the parties, the trial court imposed sentences of fifteen years for especially aggravated robbery and three years for aggravated burglary and ordered that the sentences for each conviction be served concurrently for an effective sentence of life

imprisonment. The Defendant filed a motion for new trial, which the trial court denied. This appeal follows.

## ANALYSIS

The Defendant contends that: 1) the evidence is insufficient to support the convictions; 2) the State's late disclosure of cell phone records warranted either a continuance of the trial or the exclusion of the records; and 3) the trial court erred in failing to exclude the cell phones of the Defendant and the co-defendants and the records resulting from the extractions of the cell phones because the State failed to establish the chain of custody for the cell phones.

**I. Sufficiency of the Evidence.** The Defendant challenges the sufficiency of the evidence, asserting that the evidence is insufficient to corroborate the testimony of the co-defendants as accomplices.[3] The State responds that the evidence was sufficient to corroborate the testimony of the co-defendants. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the

---

[3] While the Defendant frames the issue his brief as attacking the sufficiency of the evidence supporting his first-degree murder convictions, he cites to the elements of other convictions for especially aggravated robbery and aggravated burglary in the argument portion of his brief. Thus, we address the sufficiency of the evidence supporting all of his convictions.

- 18 -

credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As related to the present case, first-degree murder is the premeditated and intentional killing or another or the "killing of another in the perpetration of or attempt to perpetrate any … robbery [or] burglary…." Tenn. Code Ann. § 39-13-202(a)(1), (2). Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putter the person in fear." Tenn. Code Ann. § 39-13-401(a). A person commits aggravated burglary by entering a habitation without the owner's effective consent and with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401—403 (2010) (subsequently repealed, replaced by §§ 39-13-1002—1003 (Supp. 2021)).

The Defendant does not allege that the State failed to establish the elements of the convicted offenses. Rather, he asserts that the evidence is insufficient to corroborate the co-defendants' testimony regarding the Defendant's involvement and participation in the offenses.

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

In Tennessee, it is well established that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v.

State, 379 S.W.2d 34, 43 (Tenn. 1964)).  An accomplice is a person who "knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime."  State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); Clapp v. State, 30 S.W. 214, 216 (Tenn. 1895)).  To qualify as an accomplice, it is not enough that the witness possesses guilty knowledge, be morally delinquent, or even have participated in a separate but related offense.  State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).  The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. Collier, 411 S.W.3d at 894.  In this case, there is no dispute that the co-defendants, Bolden and Whiteley, were accomplices.

The Tennessee Supreme Court provided the following requirements for corroboration of accomplice testimony:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.  This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.  It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803).  One accomplice cannot corroborate another.  State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001).  The jury must determine whether sufficient corroboration of accomplice testimony exists. Shaw, 37 S.W.3d at 903.

We conclude that the testimony of Bolden and Whiteley implicating the Defendant in the offenses was sufficiently corroborated by other evidence presented at trial. Whiteley and Bolden both testified to the Defendant's contacting Bolden to participate in the planned robbery.  Bolden's cell phone records for that time period showed calls between Bolden and "Chubb," the Defendant's nickname.  Sergeant Hurst testified that he collected cell phones from the Defendant and the co-defendants, and the cell phone number listed as belonging to "Chubb" in Bolden's cell phone was the number assigned to the cell phone that Sergeant Hurst identified as belonging to the Defendant.  The Defendant also sent Bolden a text message "about s0me m0ney."

Bolden testified to he and the Defendant remaining outside the victim's home and waiting for a message from Whiteley telling them that he was leaving the victim's home. Bolden's cell phone records provide that Bolden sent Whiteley a text message stating, "we gone be outside" and that "we in the bushes across the street." The Defendant also participated in the text message exchange leading up to the offenses. According to Bolden's cell phone records, Bolden sent a text message asking the Defendant for his location and that the Defendant responded, "bay da d00d," or by the door. Shortly thereafter, the Defendant sent messages to Bolden stating, "you can g0 0n" and "Igtit," which meant either "I get it" or "I got it."

Whiteley testified that the Defendant fired one shot with a sawed-off shotgun. Dr. Ross testified that the victim was shot once with a shotgun, and the Defendant admitted to the police that the shotgun used to kill the victim belonged to him. See, e.g. State v. Quantavious Williams, No. E2019-02266-CCA-R3-CD, 2021 WL 1263987, at *7 (Tenn. Crim. App. Apr. 6, 2021), no perm. app. filed (holding that the accomplice's testimony was "sufficiently corroborated by other evidence in the record, including the defendant's own statement"); State v. Pack, 421 S.W.3d 629, 645 (Tenn. Crim. App. 2013) (concluding that the physical evidence "coupled by the defendant's statement to police" corroborated the accomplice's testimony). Compton testified that the Defendant offered to sell a sawed-off shotgun to him a few days prior to the shooting. Following the offenses, officers located shotgun cartridges along with the Defendant's license in a desk in the home where the Defendant was staying, and officers located a sawed-off shotgun hidden in the backyard with the victim's identification.

The Defendant described in detail how the offenses occurred to the police. Although the Defendant maintained that Bolden was the shooter, Bolden's testimony that he fled the scene was corroborated by Compton's testimony that Bolden came to his home during the early morning hours of December 26, that Bolden was upset and stated, "I told him not to shoot that guy," and that Bolden did not have a shotgun, drugs, or money with him. Bolden's cell phone records show that on the following day, Whiteley sent Bolden a text message, stating that Bolden was "in violation," and Bolden sent the Defendant a text message apologizing for his actions. The Defendant also admitted to the police that he received proceeds from the robbery.

The Defendant challenges the credibility of some of the testimony and maintains that other evidence presented at trial is entitled to greater weight. However, the jury, and not this court, resolves questions of credibility and the weight and value to be given to the evidence. See Bland, 958 S.W.2d at 659. Rather, we conclude that the evidence, when viewed in a light most favorable to the State and independent of the co-defendants' testimony, led to the inference that the offenses were committed, and the Defendant was

implicated in their commission. Accordingly, the co-defendants' testimony was sufficiently corroborated by other evidence presented at trial.

**II. Late-Filed Discovery.** The Defendant asserts that the State failed to provide discovery in the form of records from the extractions of the cell phones in a timely manner. The Defendant maintains that as a result, the trial court erred in failing to either exclude the records as evidence at trial or continue the trial to allow the defense to adequately review and investigate the information in the records. The State responds that the Defendant failed to show that he suffered prejudice as a result of the trial court's denial of his request for exclusion of the cell phone records or a continuance of the trial.

In February 2021, the Defendant filed a motion requesting that the State provide additional discovery, including any data collected from the cell phones of the Defendant, the co-defendants, and the victim. The Defendant's trial was scheduled to begin on June 21, 2021. During a hearing on May 27th, defense counsel announced that on the previous day, he received an email from the prosecutor regarding "newly discovered evidence" obtained from the extraction of the cell phones of the Defendant and the co-defendants. The prosecutor explained to the trial court that although an extraction had been completed on the cell phones in 2013, there had been significant advances in technology, including the ability of extract deleted items from cell phones in some situations. The State obtained a new search warrant and conducted new extractions of the cell phones. The prosecutor stated that the only significant information obtained was approximately fifteen text messages between the Defendant and the co-defendants. The prosecutor announced that he had scheduled a meeting with defense counsel during which the prosecutor would identify the relevant information in the records. The prosecutor also stated that the expert who conducted the extractions was an investigator in the prosecutor's office and that the prosecutor would make the expert available to defense counsel to answer any questions.

Defense counsel disagreed with the prosecutor's assertion regarding the advancement of technology, arguing that the technology had not advanced "in the last couple of years anyway." Defense counsel stated that he had filed a motion in February 2021 requesting the records and that the prosecutor had informed him that he had been given all of the discovery to which he was entitled. Defense counsel announced that he intended to file a motion requesting either that the evidence be excluded at trial or that he be granted a continuance in order to retain an expert to review the records and rebut the State's expert. He stated that he did not have sufficient time in which to retain an expert and review the materials prior to trial and that the State's late disclosure of the evidence violated the Defendant's due process rights.

The trial court stated that had the case been tried five years ago instead of the Defendant "monkeying around" with the court, the State would have never had the records and that the Defendant had continuously "played games" with the court. The trial court noted that evidence was to be excluded in only "the most flagrant of circumstances" and that the defense was receiving the evidence three weeks prior to trial. The trial court stated that the chance that a continuance would be granted was "not that great" because the Defendant had previously filed a motion for a speedy trial and that the Defendant had "manipulated … continuance after continuance after continuance." The trial court agreed to approve funds to allow defense counsel to retain an expert. However, the trial court stated that it did not want to continue the trial unless it was necessary to do so. The trial court suggested that the parties meet first and that if defense counsel still believed a continuance was necessary, the trial court would be available to hear the motion during the week of June 7th.

On the following day, the Defendant filed a motion to exclude the cell phone records or to continue the trial in light of the State's late disclosure of the records, incorporating the same arguments made at the hearing. However, a transcript of a hearing on the motion and an order from the trial court ruling on the motion are not included in the appellate record. According to the Defendant's motion for new trial and the trial court's order denying the motion, the Defendant filed a motion in limine on the first day of trial in which he renewed his request to continue the trial or exclude the cell phone records due to the State's late disclosure of the records, and the Defendant included additional challenges to the admission of the records, including a challenge based on chain of custody. However, the motion in limine is not included in the appellate record, and the transcript does not include any discussion regarding a continuance on the first day of trial.

Rather, on the second day of trial after the jury had been sworn but before opening statements, the trial court held a jury-out hearing during which the trial court addressed the various grounds upon which the Defendant sought to exclude the cell phone records. Defense counsel stated that the State notified him of the extracted information three weeks prior to trial, that he had to stop his trial preparation to obtain an expert, that the State provided him with 2500 pages of information from the cell phone extractions, and that he was unable to provide the records to his expert for almost two weeks "because the State didn't get it to me." The State responded that the extraction was completed after advancements in technology; that defense counsel was provided with the information within two to three days after the State received it; that the State did not "dump[ ] 2500 pages on him without any context"; that the State provided defense counsel with the time period in which they believed the information reflected in the records was relevant; and that the State provided defense counsel with a chart listing the person who called or sent a text message, the time and length of the call, and the time and substance of the text

message. Defense counsel acknowledged he was not arguing that the prosecutors "did anything wrong" once they determined that they were going to use the evidence. Rather, defense counsel argued that the State had a duty to conduct the extractions and discover the information sooner and that the records possibly included exculpatory evidence. The trial court concluded that no discovery violation had occurred and that the court had remedied any such violation by granting the defense funds to retain an expert witness to conduct an independent forensic examination of the cell phones. The trial court denied the Defendant's request to exclude the evidence.

The Defendant attached to his motion for new trial affidavits from defense counsel, the defense's investigator, and Tillery stating that defense counsel received the 2,500 pages from the State on June 2, 2021, that he forwarded the information to the investigator on June 7th, that Tillery received the cell phones to conduct an independent extraction on June 11th, that Tillery provided a report to defense counsel on June 14th, and that a thorough investigation was unable to be completed prior to the June 21st trial.

In its order denying the Defendant's motion for new trial, the trial court stated that the court denied the Defendant's motion to exclude the cell phone extraction evidence or to grant a continuance, finding that Tennessee Rule of Criminal Procedure 16 did not require that the State submit the cell phones for extraction analysis, that the prosecutors timely advised of and provided the records to defense counsel once the records were in the State's possession, and that defense counsel was aware of the existence of the cell phones and could have investigated and submitted the cell phones for analysis earlier had he chosen to do so. The trial court stated that even if the State's failure to submit the cell phones for the extraction process was a violation of Rule 16, the proper remedy was not the exclusion of evidence from the trial. In upholding the denial of the Defendant's request for a continuance, the trial court stated:

> Considering (1) the length of time that the case had been pending trial, (2) the multiple manipulation of the Defendant, (3) the fact that counsel had already had over 15 months to conduct his general investigation of the case, and (4) the fact that the Defendant was vigorously pressing a claim that he was being denied a "speedy trial," this Court decided that the better course of action was to provide the Defendant with this own cell phone extraction expert and otherwise assist the defense in being ready at trial to address this new evidence. As a result, the cell phones were subject to an independent cell phone extraction by an expert witness. The defense expert further testified in the trial verifying the accuracy of the State['s] cell phone extraction evidence and the reliability of the process and methodology used to obtain the extraction evidence.

The trial court noted that although the Defendant made assertions in his motion for new trial regarding the excessiveness of the cell phone data in alleging that the trial court erred in failing to exclude the records or grant a continuance, the excessiveness of the data was not raised in either the Defendant's motion to exclude the data or continue the trial or his motion in limine. The trial court found that the excessiveness of the data "is not being 'retroactively' raised in the motion for new trial as being a ground upon which both motions should have been granted." The trial court found that although the data was extensive, "the defense had ample time to prepare for trial in that the portion of the data pertaining to the hours in which the present crime took place is but a small portion of that data," that the defense had assistance from an investigator and a cell phone expert, that defense counsel did not make any additional requests for funding for experts or investigators, and that "defense counsel exhibited a mastery of the 'relevant' data during his cross-examination of witnesses." The trial court also found that the Defendant failed to establish prejudice from the denial of a continuance. The trial court stated that "[d]efense counsel has had more than four months post-trial to find any relevant and admissible evidence or any information in the cell phone extractions that he was not aware of at the time of the trial that might reasonably have caused a different verdict" and that "[n]o such evidence was admitted in the hearing on the motion for new trial nor was any such evidence called to the court's attention."

Tennessee Rule of Criminal Procedure 16(d)(2) provides that if a party fails to comply with the requirements of Rule 16 relating to discovery, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
(B) grant a continuance;
(C) prohibit the party from introducing the undisclosed evidence; or
(D) enter such other order as it deems just under the circumstances.

"'A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case.'" State v. Giles, 493 S.W.3d 504, 521 (Tenn. Crim. App. 2016) (quoting State v. Downey, 259 S.W.3d 723, 737 (Tenn. 2008)). The prejudice to the defendant resulting from the State's failure to disclose discovery materials "'is a significant factor in determining an appropriate remedy.'" Id. (quoting State v. Gann, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007)).

The granting of a continuance lies within the sound discretion of the trial court. State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced

by the denial.  State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995).  To establish prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the failure to grant the continuance denied the defendant a fair trial.  Id.

On appeal, the Defendant does not allege, as argued in the trial court, that the State had a duty to conduct extractions of the cell phones pursuant to Tennessee Rule of Criminal Procedure 16, and the Defendant does not cite to Rule 16 in his brief.  Rather, he argues that defense counsel did not have a sufficient amount of time in which to review and investigate the voluminous amount of data from the extractions.  He maintains that the trial court, thus, abused its discretion in denying a continuance.

Our review of the issue is somewhat hindered by the limited appellate record on the issue.  Although the trial court made statements regarding the likelihood of granting a continuance prior to the Defendant's filing the motion, the court also stated that it would hear any requests for a continuance if the prosecutors and defense counsel were unable to reach a resolution following their meeting.   The Defendant subsequently filed a motion to either exclude the evidence or continue the trial.  However, it is unclear whether a separate hearing was held, and the appellate record does not include an order from the trial court denying the motion.  The record indicates that the Defendant renewed his request to exclude the cell phone records or continue the trial in a motion in limine filed on the first day of trial.  However, the motion in limine is not included in the appellate record, and the trial transcript includes no discussion regarding the Defendant's request for a continuance.  The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."  Tenn. R. App. P. 24(b).  "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence."  State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citations omitted).

Regardless, this court has recognized that "[e]xclusion of evidence is a 'drastic remedy and should not be implemented unless there is no other reasonable alternative.'"  State v. Gann, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007) (quoting State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995)); see Giles, 493 S.W.3d at 521.  We cannot conclude that the trial court abused its discretion by declining to exclude the cell phone records and, instead, approving funds to allow the defense to retain an expert and conduct separate extractions of the cell phones.  Further, the Defendant has failed to establish that the trial court's denial of a continuance resulted in prejudice such that he was denied a fair trial or that he would have otherwise received a different result.  The record reflects that defense counsel extensively cross-examined witnesses using information contained in the cell phone records and that he was able to present evidence obtained from the records that was favorable to the defense.  At trial, the defense offered

the testimony of Micheal Tillery, an expert in digital and cellular phone extraction, who testified that he performed a full extraction on the three phones recovered in this case, that there were only "subtle" differences between his extraction report and the extraction report of the State, and that there were no differences of evidentiary value in his report. Overall, Tillery explained that he was "very happy with everything the State had turned over. It was a good extraction." The Defendant did not present any proof at the hearing on the motion for new trial establishing that additional time to review the records and conduct a further investigation could have provided additional helpful evidence. See, e.g. State v. Bruce D. Mendenhall, No. M2018-02089-CCA-R3-CD, 2020 WL 2494479, at *32 (Tenn. Crim. App. May 14, 2020) (holding that the defendant failed to establish that the denial of a continuance requested as a result of the State's failure to tun over surveillance video until a few weeks prior to trial resulted in prejudice when the defendant failed to present proof at the motion for new trial hearing that more time to review the recordings would have resulted in additional helpful evidence).

The Defendant asserts that defense counsel did not receive the jail records pertaining to the co-defendants in a timely manner, which also warranted a continuance of the trial. During the second day of trial and prior to opening statement, defense counsel announced that he had issued a subpoena for the jail records to be delivered to the courtroom but that he had not yet received them. The subpoena is not included in the appellate record, but the trial court noted in its order denying the motion for new trial that the subpoena required that the records be delivered on "the date the trial was to commence." Defense counsel obtained the jail records prior to opening statements, and the trial court gave defense counsel time to review the records. The Defendant did not seek a continuance of the trial to review and investigate the information in the records and, thus, has waived the issue. See, e.g. State v. Allen, 593 S.W.3d 145, 154 (Tenn. 2020) ("Generally, issues raised for the first time on appeal are waived."). The Defendant is not entitled to relief regarding this issue.

**III.** **Chain of Custody.** The Defendant asserts that the State failed to establish the chain of custody for the cell phones of the Defendant and the co-defendants and that the trial court, therefore, erred in admitting the cell phones and the extraction records from the cell phones. The State responds that the chain of custody for the cell phones was established at trial.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Therefore, the question of whether tangible evidence has been properly authenticated is left to the discretion of the trial court. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech,

744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). The trial court's determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998) (citing Beech, 744 S.W.2d at 587). Therefore, we will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

To admit tangible evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. Cannon, 254 S.W.3d at 296; Holbrooks, 983 S.W.2d at 700 (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982)). This rule ensures that "'there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Scott, 33 S.W.3d at 760 (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, absolute certainty of identification is not required. See State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing Ritter v. State, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970)). In addition, the Tennessee Supreme Court has observed:

> Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item. Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. On the other hand, if the State fails to offer sufficient proof of the chain of custody, the evidence should not be admitted ... unless both identity and integrity can be demonstrated by other appropriate means.

Cannon, 254 S.W.3d at 295-96 (internal citations and quotation omitted).

Prior to opening statements, the trial court held a jury-out hearing on the Defendant's motion in limine. Although the motion in limine is not included in the appellate record, the transcript of the hearing reflects that the Defendant made multiple challenges to the admissibility of the cell phones and the extraction records, including a challenge based on the chain of custody of the cell phones. The trial court did not make a definitive ruling on the chain of custody issue, stating, "I'll deal with that during the course of the trial." The trial court stated, "I still think the State needs to lay the proper foundation for chain of custody and reliability during the officer's testimony."

Defense counsel did not object when the State entered the cell phones into evidence during Sergeant Hurst's testimony at trial. During defense counsel's cross-examination of Sergeant Hurst, the trial court held a bench conference during which the court stated that defense counsel had previously made an objection based on chain of custody and that the court did not want Sergeant Hurst to leave if "it's still an active objection." Defense counsel responded that he had a few questions but that he wanted the opportunity to view the exhibits. The trial court responded, "I just don't want to let him go if we need to ask him where these phones have been." Defense counsel stated that the defense had served Sergeant Hurst with a subpoena and that defense counsel would inform Sergeant Hurst whether the defense intended to call him as a witness at trial before Sergeant Hurst left to return to his home in East Tennessee. The trial court stated that the court did not know whether chain of custody "was a contested issue or not" and instructed defense counsel to "just make up your mind" before Sergeant Hurst left. Defense counsel questioned Sergeant Hurst on cross-examination regarding his recovery of the cell phones and where and when the cell phones were transferred to other locations. However, defense counsel did not challenge the admissibility of the cell phones or make any argument to the trial court regarding chain or custody, and defense counsel did not recall Sergeant Hurst as a witness for the defense.

Defense counsel did not object when the State entered the extraction records from the cell phones into evidence during Investigator Flint's testimony at trial. Defense counsel objected to Investigator Flint's testimony at trial categorizing one of the cell phones as belonging to the Defendant. Defense counsel did not make an argument based on chain of custody but argued that the State failed to lay the proper foundation for the testimony that the Defendant was the owner of the cell phone. Defense counsel noted that although the cell phones attributed to Bolden and Whiteley were registered to them, the cell phone attributed to the Defendant was registered to a third party. Defense counsel clarified, "I'm not asking that the phone be excluded. I'm asking for the way in which this is being expressed by Mr. Flint on direct examination is that he's making a misleading statement." The trial court overruled defense counsel's objection, and the Defendant does not challenge the trial court's ruling on appeal.

The Tennessee Supreme Court has recognized that "'where the record on a pretrial suppression motion or on a motion in limine clearly present an evidentiary question and where the trial judge has clearly and definitively ruled,' defense counsel need not offer further objections to the trial court's ruling." State v. Walls, 537 S.W.3d 892, 899 (Tenn. 2017) (quoting State v. McGhee, 746 S.W.2d 460, 462 (Tenn. 1988)). However, "in cases in which the 'issues are only tentatively suggested or the record only partially and incompletely developed[,] … [c]ounsel necessarily take some calculated risks in not renewing objections.'" Id. (quoting McGhee, 746 S.W.2d at 462).

The trial court specifically reserved ruling on the Defendant's motion in limine challenging the admissibility of the cell phones and the extraction records based on a chain of custody argument until further testimony was developed at trial. Because the trial court did not definitively rule on the motion, the Defendant was not relieved of his obligation of renewing his objection to the admissibility of the cell phones and the extraction records at trial. Not only did defense counsel fail to object when the State entered the cell phones and extraction records into evidence, defense counsel did not pursue a chain of custody challenge when the trial court specifically asked him whether he intended to pursue the challenge. Defense counsel later made it clear in objecting to testimony on a different basis that he was not challenging the admissibility of the cell phone attributable to the Defendant. Thus, the record establishes that the Defendant abandoned his chain of custody challenge to the admissibility of the cell phones and the extraction records at trial. If a motion is not acted upon, the defendant "'may not lull a judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of a forgotten motion.'" State v. Banks, 271 S.W.3d 90, 170 (Tenn. 2008) (appendix) (quoting United States v. Taglia, 922 F.2d 413, 416-17 (7th Cir. 1991)). Because the Defendant abandoned the challenge at trial, he has waived the issue for purposes of appeal. See Tenn. R. App. P. 36(a).

Furthermore, we cannot conclude that the admission of the evidence rises to the level of plain error. Under the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

- 30 -

The record fails to establish that the Defendant did not waive the issue for tactical reasons. The trial court specifically asked defense counsel whether he intended to pursue the chain of custody issue, and defense counsel did not argue the issue. The defense also utilized evidence from the extraction records to support the Defendant's statement to the police that Bolden was the shooter. Defense counsel argued that the text message exchange leading up to the shooting was primarily between Bolden and Whiteley and included the specific details of how the robbery was to occur. The defense presented a photograph from Bolden's cell phone depicting Bolden in possession of a shotgun a few days prior to the shooting and a text message exchange between Bolden and the victim that occurred during the same time period and that the defense maintained was combative. In light of defense counsel's response to the trial court's questioning about whether he intended to pursue a chain of custody challenge and the evidence from the extraction records that was relied upon and presented by the defense at trial, the record indicates that the defense counsel made a strategic decision to abandon the chain of custody challenge to the admissibility of the cell phones and the extraction records. Accordingly, the Defendant has failed to establish plain error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE